UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

EARL E. SHARPE, JR.,

      Plaintiff,

      v.

PRINCE GEORGE'S COUNTY
GOVERNMENT,

      Defendant.

Civil Action No. TDC-17-3799

## MEMORANDUM OPINION

Plaintiff Officer Earl E. Sharpe, Jr., an African American police officer serving at the Prince George's County Police Department ("PGCPD") in Prince George's County, Maryland ("the County"), has filed suit against the County alleging race discrimination and retaliation in violation of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d (2018), and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17, based on discriminatory discipline and disparate treatment in assignments and performance evaluations. Pending before the Court is the County's Motion for Summary Judgment, which is fully briefed. Having reviewed the briefs and submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.    The 2014 Insurance Claim

Officer Sharpe joined the PGCPD in 2007 and was assigned to District III as a patrol officer. On or about October 15, 2011, while on duty and responding to a call, Officer Sharpe was

involved in a car accident after he swerved to avoid another car and hit a pole and the curb, causing extensive damage to his police vehicle. Officer Sharpe sustained minor injuries to his back and side. About a week after the car accident, while Officer Sharpe was back at work, he felt numbness in his arm. Another officer took his blood pressure, which was extremely high. Officer Sharpe was rushed to a nearby hospital, where he was told that he had had a transient ischemic attack, or a "mini stroke." Joint Record ("J.R.") 8. Based on the timing of the incident, Officer Sharpe believed that it was related to the car accident. Officer Sharpe underwent follow-up tests and was given documentation that he was to be on "no duty" status from October 31, 2011 to December 19, 2011. J.R. 50. Despite being on "no duty" status, Officer Sharpe generally reported to work during that period.

In or about 2012, Officer Sharpe transferred to District III's Assault Squad, a unit tasked with responding to non-homicide shootings, where he remained for about a year before he was transferred in 2013 to a Robbery Suppression Team ("RST") in District II. Although Officer Sharpe had not requested the transfer, he was happy about it. At the time Officer Sharpe transferred to RST, Sergeant ("Sgt.") Thomas Calmon, who is white, was the RST supervisor and Corporal ("Cpl.") Marshall Booze, who is African American, was the "9 car," the term for a unit's assistant supervisor. J.R. 4.

At around this time, Officer Sharpe was continuing to have symptoms that he attributed to the October 2011 accident, so at some point in 2013 or 2014, he filed a worker's compensation claim. In addition, Officer Sharpe filed a claim against the other driver involved in the October 2011 accident. In a December 14, 2013 demand letter to Progressive Insurance ("Progressive"), which insured the other driver, Officer Sharpe's attorney asked for a total of $12,661.99 in compensation, including $7,899.99 in lost wages for the period from October 31, 2011 to

2

December 19, 2011. On January 13, 2014, a paralegal working for Officer Sharpe's attorney sent to Officer Sharpe an email attaching a loss wage verification form ("the Wage Loss Form"), to be completed by Officer Sharpe and signed by his supervisor. The completed form states that between October 15, 2011 and October 29, 2011, Officer Sharpe lost 80 hours of work, at an hourly rate of $28.80, for a total of $2,304 in lost wages. While Officer Sharpe's hourly wage as of January 2014 was $28.80, his hourly wage for the time period identified in 2011 was only $23.19. Although Officer Sharpe told Cpl. Booze about the form and asked for and received permission from Cpl. Booze to list him as Officer Sharpe's acting sergeant, Officer Sharpe eventually sent the form back to his attorney unsigned, but provided Cpl. Booze's name, identifying him as his acting sergeant.

On February 6, 2014, Officer Sharpe's attorney sent the unsigned form onto Progressive. A Progressive representative then tried repeatedly to contact Cpl. Booze to contest Officer Sharpe's claim, prompting Cpl. Booze to inform Sgt. Calmon of the situation. Sgt. Calmon, in turn, spoke to the Progressive representative about the matter, received a copy of the Wage Loss Form, then pulled Officer Sharpe's payroll records and discovered that Officer Sharpe had been paid for the period from October 15, 2011 through October 29, 2011. Sgt. Calmon contacted Officer Sharpe's attorney, who would provide him with no further information. Based on this information, Sgt. Calmon began to suspect that Officer Sharpe was engaged in insurance fraud, and he informed his superiors of his suspicions, prompting an internal investigation. At around this time, Sgt. Calmon saw an email from Officer Sharpe's attorney to Cpl. Booze stating that Sgt. Calmon had made an accusation of fraud and was personally holding up the payment of Officer Sharpe's claim.

News of Sgt. Calmon's suspicions reached Officer Sharpe, and on March 18, 2014, Officer Sharpe sent Sgt. Calmon a text message stating that his attorney had called him to let him know of

3

Sgt. Calmon's suspicions, but denying any fraud and instead asserting, "Maybe it was a mix up or something." J.R. 243. According to Cpl. Booze, Officer Sharpe told him that if he was going to be investigated he would "protect himself," noting that a family member had worked on the campaign of Prince George's County Executive Rushern Baker. J.R. 245. On April 16, 2014, Sgt. Calmon received a text message from Officer Sharpe stating, "My sister in law got me another meeting with Mr. Baker. So I will call you tomorrow Tracy and thanks." J.R. 244.

## II.      Investigation and Disciplinary Proceedings

Meanwhile, on March 12, 2014, the PGCPD Internal Affairs Division ("IAD") opened an investigation into Officer Sharpe's claim against Progressive, which was assigned to Sgt. Michael Rubin. As part of his investigation, Sgt. Rubin interviewed Officer Sharpe and three other police officers, including Sgt. Calmon and Cpl. Booze. He also reviewed documents from Progressive, including Officer Sharpe's Wage Loss Form. Based on the email exchange between Officer Sharpe's attorney and Cpl. Booze, and the text messages from Officer Sharpe to Sgt. Calmon, Sgt. Rubin expanded the investigation to the issue of possible witness intimidation.

At some point in June 2014, Sgt. Rubin discussed his investigation with the State's Attorney's Office, Special Prosecutions Unit, which declined to prosecute. On October 7, 2015, Sgt. Rubin submitted his written report on the investigation to Lieutenant ("Lt.") Joseph Perez for review. Sgt. Rubin's report addressed three allegations of violations of the PGCPD General Order Manual. Charge 1, a violation of Attention to Duty, was based on Officer Sharpe's completion of the Wage Loss Form using dates for which he had been paid his regular salary. Sgt. Rubin recommended that the charge be sustained, because his investigation had produced sufficient evidence that Officer Sharpe had completed the form with information that he knew to be inaccurate. Charge 2, for Unbecoming Conduct, was based on the submission of the form to

4

Progressive. Sgt. Rubin recommended a non-sustained finding for this charge, because he had discovered no evidence that Officer Sharpe was aware that his attorney had sent the form to Progressive to make a claim on his behalf. Sgt. Rubin instead concluded that Officer Sharpe had not knowingly requested reimbursement for lost wages covering a period for which he had been paid in full, and that the submission of a claim for those wages was the result of an error on the part of his attorney's office. Sgt. Rubin based this conclusion on his observation that the document faxed to Progressive had two horizontal lines running across it, suggesting that the completed form had been cut and taped onto letterhead from Officer Sharpe's attorney's office. Charge 3, a second Unbecoming Conduct charge, stemmed from the April 16, 2014 text message that Officer Sharpe had sent to Sgt. Calmon arguably implying that he had met with the County Executive. Sgt. Rubin concluded that Officer Sharpe had sent the text message with the intention of discouraging Sgt. Calmon from pursuing an investigation into Officer Sharpe's Wage Loss Form and related insurance claim, so he recommended that the charge be sustained.

The report made its way through several layers of review and revision within IAD among Sgt. Rubin, Lt. Perez, Captain ("Capt.") Sandy Jernigan, and Major Rafael Grant. In January 2016, Capt. Jernigan sent the report back to Sgt. Rubin for revisions, explaining that Major Grant wanted him to conduct another interview with Officer Sharpe and that he wanted Sgt. Rubin to include in the report a charge for making a false statement. Sgt. Rubin conducted a second interview with Officer Sharpe, resubmitted his report to Capt. Jernigan, and told her that he did not change his recommendations or add an allegation of making a false statement. When Capt. Jernigan emphasized that Major Grant wanted a false statement in the report, Sgt. Rubin refused to alter his submission, asserting that in his estimation, Officer Sharpe had not made a false statement. Capt.

5

Jernigan repeated her concern about the lack of a false statement allegation in several other conversations with Sgt. Rubin.

A few weeks later, Major Grant telephoned Sgt. Rubin about the report and told him that he was uncomfortable with Sgt. Rubin's failure to include a false statement allegation. After a 30- to 40-minute phone conversation, Sgt. Rubin repeated his position that he did not believe that Officer Sharpe had made a false statement, so he would not be adding it. In total, Sgt. Rubin's report went through nine rounds of edits.

On February 1, 2016, Major Grant issued the final report of the IAD investigation. The report included, as Allegations 1 and 4, Sgt. Rubin's original allegations of (1) Unbecoming Conduct based on the Wage Loss Form; and (4) Unbecoming Conduct based on the alleged witness intimidation, but it also included, as Allegations 2 and 3, two more serious allegations: (2) False Statement and (3) Misrepresentation of Fact, both based on the Wage Loss Form. Unlike the Attention to Duty and Unbecoming Conduct allegations, which are based on the PGCPD General Order Manual, the False Statement and Misrepresentation of Fact allegations stemmed from section 18-160(b) of the Prince George's County Code, which states, "No member of the Police Department, under any circumstances, shall make any false official statement or intentional misrepresentation of facts." Major Grant recommended that the three allegations based on the Wage Loss Form be sustained, and that the Unbecoming Conduct allegation based on witness intimidation not be sustained.

As to the basis for the determinations on the False Statement and Misrepresentation of Fact allegations, the final report stated only that the investigation had yielded sufficient evidence that Officer Sharpe submitted the Wage Loss Form knowing that the information was inaccurate. As for the allegation of Unbecoming Conduct based on witness intimidation, the final report

6

concluded that the evidence did not conclusively establish that the text message was sent deliberately, rather than accidentally.

In a memorandum providing a Disciplinary Action Recommendation dated February 5, 2016, the then-Interim Chief of Police Henry P. Stawinski, III ("Chief Stawinski") adopted the final report's recommendations and charged Officer Sharpe with (1) Unbecoming Conduct, (2) False Statement, and (3) Misrepresentation of Fact. Chief Stawinski informed Officer Sharpe that, based on those charges, he intended to terminate Officer Sharpe and to fine him $250.00. That same day, Officer Sharpe was placed on suspension with pay, a status that lasted until the case against him was resolved.

Officer Sharpe contested Chief Stawinski's Disciplinary Action Recommendation and requested a hearing before the Administrative Hearing Board ("AHB"). The AHB hearing occurred on September 23, 2016 before a three-member panel consisting of Major Irene Burks, Capt. Cynthia Ruff, and Police Officer First Class Exau Marin-Henriquez. After hearing testimony, including from Sgt. Calmon, Cpl. Booze, Sgt. Rubin, and Officer Sharpe, and considering exhibits including the documents sent to Progressive as well as transcripts of interviews conducted as part of the IAD investigation, the AHB found Officer Sharpe guilty on the charges of Unbecoming Conduct and Misrepresentation of Fact, and not guilty on the charge of False Statement. The AHB unanimously found that the County had demonstrated by a preponderance of the evidence that by stating on the Wage Loss Form that he was not working from October 15 to October 29, 2011, Officer Sharpe had misrepresented his lost wages, constituting a Misrepresentation of Fact and Unbecoming Conduct. A majority of the AHB found Officer Sharpe not guilty of a False Statement, primarily based on Sgt. Rubin's conclusion that the document faxed to Progressive appeared to be cut and pasted. The AHB also took note of the fact

7

that in the December 2013 demand letter to Progressive, Officer Sharpe's attorney sought a total of $12,661.99 from Progressive, including $7,899.99 in lost wages, figures that did not correspond with the $2,304 on the Wage Loss Form. This evidence suggested to the AHB that, in submitting the Progressive claim, Officer Sharpe's attorney was acting without Officer Sharpe's full knowledge or understanding.

Based on their findings, the AHB recommended that, on the charge of Unbecoming Conduct, Officer Sharpe be reduced in rank, removed from the promotional cycle for one year, and suspended for 40 hours without pay. On the Misrepresentation of Fact charge, the AHB recommended that Officer Sharpe be suspended for 20 hours without pay.

On March 7, 2017, Chief Stawinski, now the permanent Chief of PGCPD, adopted the AHB's recommendations and imposed these sanctions. Officer Sharpe declined to exercise his right to appeal the decision to state court. Officer Sharpe was thus demoted from Police Officer First Class to Police Officer. However, in May 2015, Officer Sharpe had taken and passed the corporal's exam, but, in accordance with PGCPD policy, because he was the subject of an open IAD investigation, he had not been promoted. Accordingly, in his estimation, he had been effectively demoted by two ranks.

## III.   Comparators

In alleging discriminatory discipline, Officer Sharpe identifies 19 incidents that he offers as examples in which white officers were investigated for comparable misconduct and were, in his view, treated less severely. Of these incidents, the two most relevant incidents are those involving investigations for alleged false statements or misrepresentations by a police officer.

## A.    Cpl. Thomas Denault

In June 2015, IAD opened an investigation into Cpl. Thomas Denault, who is white, based on a dispute that he had with his neighbor and subsequent events.  The investigation found that on June 14, 2015, Cpl. Denault stopped a commercial truck, which he was allegedly using as part of an unlicensed commercial business, in the driveway he shared with his neighbors, blocking them from exiting.  After trying unsuccessfully to drive around the truck, one of the neighbors approached Cpl. Denault and asked him to move his vehicle out of the way, but he would not respond and instead stared out the truck window at the neighbor's husband.  When Cpl. Denault ignored the neighbor's additional requests that he move his truck, the husband called the police.  The neighbor, who was aware that Cpl. Denault was a police officer, rolled up her window, concerned that he might have his service weapon with him in his truck.  The confrontation lasted for 20-25 minutes until the Howard County Police arrived and defused the situation.  The next day, Cpl. Denault and his neighbors each sought peace orders against each other in the District Court of Maryland for Howard County.  At a hearing on the petitions for peace orders on June 15, 2015, when the judge asked Cpl. Denault whether he was employed, he stated, under oath, only that he was self-employed, without identifying himself as a police officer, and he told the judge that he was "[s]cared for his safety" because his neighbor was a military veteran with training and experience.  J.R. 717.  At a second hearing on the petitions on July 13, 2015, when asked by his neighbors' counsel for his occupation, Cpl. Denault testified first that he was self-employed, then stated that he ran an asphalt and seal company, without stating that he was a police officer.  Only when the attorney pressed him on whether he had "any other occupation" did Cpl. Denault testify that he is a police officer.  J.R. 717.

IAD's preliminary report was completed in early September 2015, after only two rounds of editing and review. On December 1, 2015, Capt. Jernigan issued the final Disciplinary Action Recommendation, in which she proposed one charge of False Statement with a penalty of suspension without pay for 10 hours. Cpl. Denault waived his right to an AHB hearing and accepted that discipline on December 14, 2015. On February 29, 2016, Major Grant downgraded the official charge against Cpl. Denault to Misrepresentation of Facts, with no change to the recommended discipline. Cpl. Denault raised no objection to the amendment, and Chief Stawinski issued the Final Disciplinary Action on March 9, 2016. Meanwhile, on January 20, 2016, Cpl. Denault was promoted to Sergeant.

### B. Cpl. Donald Rickert

In 2017, Cpl. Rickert was assigned to District I Patrol and also worked part-time at Prince George's Hospital ("PGH") and Laurel Regional Hospital ("LRH"). In December 2016, Sgt. Steven Robinson was made the Officer in Charge of the squad, and in that role he had heard from other officers about payroll and scheduling issues relating to Cpl. Rickert. In particular, Sgt. Robinson learned that Cpl. Rickert worked four to five part-time jobs in addition to his PGCPD position, and that Cpl. Rickert had been working part-time while also on the PGCPD clock, working multiple part-time shifts such that he ended up sleeping on his patrol shift, and clocking in for certain hours during which he was not at work. In mid-February 2017, Sgt. Robinson noticed that Cpl. Rickert had changed his schedule for one day from a 3:00 p.m. to 1:00 a.m. shift to a 4:00 p.m. to 2:00 a.m. shift. Sgt. Robinson had a policy of not allowing officers to adjust their schedules to accommodate secondary employment. When Sgt. Robinson asked Cpl. Rickert about the change, Cpl. Rickert stated that he had worked until 4:00 p.m. at his secondary employment, so he altered his PGCPD hours accordingly. Sgt. Robinson informed Cpl. Rickert that he would no

longer be permitted to complete and approve the squad payroll. At a squad meeting in early March 2017, Sgt. Robinson informed his officers that they were required to notify him before changing their schedules and would be required to submit monthly secondary employment logs.

On March 30, 2017, Cpl. Rickert was assigned to the firearms range from 3:00 p.m. to 1:00 a.m. for in-service training. That day, Cpl. Rickert picked up his police cruiser at 11:00 a.m., had lunch with a fellow officer, and then reported to the range at 3:00 p.m., where he remained until 10:30 p.m. Cpl. Rickert officially began his shift at PGH at 9:00 p.m., but he did not "call out," so as to inform his PGCPD squad that he was off-duty, until 11:05 p.m. J.R. 745. At about 10:30 or 10:45 p.m., Cpl. Gregory Taylor, who coordinated secondary employment at PGH and LRH for PGCPD officers, saw Cpl. Rickert's police cruiser in the PGH parking lot and received a call from Cpl. Rickert stating that he was working at PGH. Cpl. Taylor had scheduled Cpl. Rickert to work at PGH from 1:00 a.m. to 6:00 a.m. on March 31, not beginning at 9:00 p.m. on March 30.

While at PGH, Cpl. Rickert logged into the PGCPD payroll system. Sgt. Robinson had already entered Cpl. Rickert's PGCPD hours as 3:00 p.m. to 1:00 a.m., but Cpl. Rickert adjusted them to 11:00 a.m. to 9:00 p.m. Sgt. Robinson changed the hours back. When Sgt. Robinson later asked Cpl. Rickert about the schedule change, Cpl. Rickert did not inform him that he was working secondary employment and instead stated only that he had picked up his police cruiser at 11:00 a.m. and had been released from the range at 9:00 p.m. Sgt. Robinson left the hours as 3:00 p.m. to 1:00 a.m. and denied Cpl. Rickert's subsequent request for leave from 9:00 p.m. to 1:00 a.m., the hours he was working at PGH.

At the beginning of April 2017, during a discussion with Cpl. Taylor, Sgt. Robinson learned for the first time of Cpl. Rickert's work at PGH, and that the PGH job was the reason for his March 30 schedule change. On April 3, 2017, Cpl. Rickert contacted individuals in the PGH

payroll department and asked them to show him how to alter his PGH payroll records. Ultimately, Cpl. Rickert was officially paid by PGH for a shift from 1:00 a.m. to 6:00 a.m. on March 31, 2017, not the hours he had actually worked there.

The initial IAD investigation into Cpl. Rickert's case was completed in September 2018. The final report was issued on January 7, 2019. That report contained six allegations: (1) Integrity; (2) Procedural (Vehicle Maintenance); (3) Misrepresentation of Facts; (4) Notification to Public Safety Communication; (5) Compliance with Order from Superior Authority; and (6) Extra-Duty Employment Violation. Only two of those charges were sustained, the Integrity and Compliance with Order from Superior Authority charges, based on Cpl. Rickert's changing of his schedule in the PGCPD payroll system despite Sgt. Robinson's prior express instruction not to do so.

The Procedural (Vehicle Maintenance) charge, based on a General Order requirement that all scheduled vehicle maintenance is to be performed when an employee is off-duty, and the Notification to Public Safety Communication charge, based on Cpl. Rickert's failure to call-out until 11:05 p.m., after he was already working at PGH, were non-sustained. The Vehicle Maintenance charge was non-sustained because although Cpl. Rickert picked up his police cruiser at 11:00 a.m. on March 30 and apparently obtained maintenance for it, because Sgt. Robinson had not allowed him to change his schedule in the payroll system, he had not technically been on duty until 3:00 p.m. that day and so had no prohibited on-duty maintenance. Likewise, the Notification to Public Safety Communication charge was non-sustained because, in the end, Cpl. Rickert had not been permitted to change his PGCPD schedule and thus officially worked from 3:00 p.m. until 1:00 a.m., and he was able to change his official PGH schedule that evening to 1:00 a.m. to 6:00 a.m., so his 11:05 p.m. call-out had not technically been late. Had Cpl. Rickert actually been

12

allowed to change his PGCPD schedule to 11:00 a.m. to 9:00 p.m. as he had attempted to do, both of these violations would have occurred.

The remaining two charges, for Misrepresentation of Facts and Extra-Duty Employment Violation, were determined to be Unfounded. On the charge of Misrepresentation of Fact, the final report states that the investigation "found sufficient evidence to prove" that, although Cpl. Rickert did not inform Sgt. Robinson of his secondary employment when they first spoke about the changes to Cpl. Rickert's March 30, 2017 hours, Cpl. Rickert's statement that he "needed leave because he was out of his assigned work area" was not inaccurate, as he was at PGH. J.R. 755. The Extra-Duty Employment Violation allegation was deemed unfounded because, although it prohibits receiving payment from two or more employers simultaneously without permission, Cpl. Rickert had altered his PGH payroll records so as to avoid overlapping hours.

Based on the two sustained violations, IAD recommended that Cpl. Rickert be suspended without pay for two days and fined $250.00. Cpl. Rickert accepted the proposed discipline. He was not removed from the promotional list. In fact, while the IAD investigation was pending, Cpl. Rickert was promoted to Sergeant.

## IV.     2016 Transfer and Performance Evaluation

In 2014, because of continuing tension between Officer Sharpe and Sgt. Calmon stemming from the Wage Loss Form, Officer Sharpe was transferred to an RST in District III. Sgt. Daren Rush, who is white, was also assigned to that RST, specifically the "sister" squad of the one to which Officer Sharpe was assigned. J.R. 22. At some point in 2015, Sgt. Rush was assigned as the "9 car" for the squad.

In April 2015, shortly before the promotional exam, Sgt. Rush texted a video to various members of the squad sitting for the exam, including Officer Sharpe, with a scene from the movie

13

*Lean on Me* in which a character gives a motivational speech that contained various racial epithets. Officer Sharpe found the video offensive, as did others, and the issue was reported to IAD, prompting an investigation. Sgt. Rush was ultimately charged with a Use of Language violation, with recommended discipline of a $500 fine. In the Final Disciplinary Action, Sgt. Rush's fine was reduced to $250.

In June 2015, Sgt. Michael Soden transferred in to lead the RST. Sgt. Soden's "9 car" officers were Cpl. Chad Miller and Detective ("Det.") Darryl Wormuth, who is white. Det. Wormuth was a friend of Sgt. Rush, and Officer Sharpe had previously observed that Sgt. Rush would direct Black officers to respond to calls, rather than making Det. Wormuth respond. When Sgt. Soden was first assigned to the RST, he was aware that there had been "a lot of turmoil" in the unit. J.R. 116.

In October 2015, Sgt. Soden completed Officer Sharpe's 2015 performance evaluation. Overall, Sgt. Soden gave Officer Sharpe a rating of "Outstanding," the highest of five categories, with a score of 3.95 out of 4.0. J.R. 146. Officer Sharpe also received an "Outstanding" rating in the categories of "Investigation and Reporting Function," "Prepares Reports/Court Presentation," and "Enforces Laws." *Id.* He received the next-lowest rating of "Exceeds Satisfactory" in the final category of "Other Assigned Duties." *Id.* Sgt. Soden described Officer Sharpe as a "dedicated investigator" who utilized his skills well and was becoming "very well rounded." J.R. 147. Sgt. Soden "encouraged" Officer Sharpe to take advantage of future promotional opportunities. *Id.*

Over the next two months, however, the squad dynamics worsened and, in Sgt. Soden's estimation, affected his ability to foster a team environment. On November 17, 2015, Det. Wormuth reported to Sgt. Soden that Officer Sharpe had refused to assist with all but one of the

open incidents, responded to Det. Wormuth's directive by stating, "I'm not doing shit," and spent the shift sitting at his computer with headphones. J.R. 155. When Det. Wormuth and another member of the squad were unable to finish the work, it was passed on to the day shift. Sgt. Soden did not personally observe the entire interaction, but he did see Officer Sharpe sitting at his computer with his headphones on and found Det. Wormuth's account to be consistent with the case logs. Officer Sharpe, however, has stated that when he was seen sitting in the police station with headphones, he was actually working by reviewing recorded evidence.

That same day, in response to a recent string of carjackings, Officer Sharpe was asked to conduct a pre-raid on a house for which there was a search warrant. Officer Sharpe resisted and stated that he was going to tell Cpl. Miller and Sgt. Rush that it was "bullshit" and that he was "tired of being told to do shit." J.R. 150–51.

On December 15, 2015, while the apparent victim of a robbery was in the police station to be interviewed, Officer Sharpe disagreed with Det. Wormuth's assessment that the robbery was an armed robbery, told Det. Wormuth that he was done with the case, and refused to take a statement from the victim. The confrontation took place within earshot of the victim and in front of visiting officers from a training unit in the Bowie Police Department. According to Officer Sharpe, he had concluded that the robbery victim was lying, and she had admitted that the event had not actually happened, so he did not want to participate in taking the statement.

In a December 16, 2015 email to Lt. Sunny Mrotek, Sgt. Soden's supervisor, Sgt. Soden recounted these incidents and recommended that Officer Sharpe be transferred. Sgt. Soden explained that while Officer Sharpe was a "more than capable investigator" and had always done what Sgt. Soden had asked without incident, he had otherwise demonstrated "quarrelsome behaviors" and had a "difficult time taking direction from others." J.R. 150. Sgt. Soden noted that

he had secured training opportunities for Officer Sharpe, including a trip to New Mexico, in an effort to foster a change in his behavior, but without success. He concluded that Officer Sharpe's attitude was detrimental to his team-building efforts in the unit and that Officer Sharpe would therefore be "better suited in a different unit." J.R. 151. When making this recommendation, Sgt. Soden was unaware that Officer Sharpe was under an IAD investigation and did not know of any complaints Officer Sharpe had made relating to discrimination. As a result of Sgt. Soden's recommendation, which made its way through several layers of review, Chief Stawinski ultimately decided to transfer Officer Sharpe to District III Patrol in January 2016. Because the transfer from RST to Patrol meant that Officer Sharpe was no longer performing investigative work, he lost many opportunities for overtime. Officer Sharpe does not contend that Sgt. Soden had discriminatory intent, but he has asserted that Sgt. Soden's conclusions were based solely on lies told by Sgt. Rush and Det. Wormuth, and that Sgt. Soden had not raised any concerns with Officer Sharpe before the transfer.

In his 2016 performance evaluation, issued in November 2016 by Sgt. Joel Benjamin of District III Patrol while Officer Sharpe was on desk duty because of the ongoing IAD investigation, Officer Sharpe received an overall rating of "Exceeds Satisfactory," the second highest category, and received a score of 2.75 out of 4. J.R. 1236. He received an Outstanding rating in the category of Preliminary Investigation and Reports; Exceeds Satisfactory ratings in Arrests and Court Presentations and Other Assigned Duties; and Satisfactory ratings, the third highest category, in Patrol/Repression of Crime and Leads Subordinates.

## V.    2018 Transfer Applications

In April 2017, after the conclusion of the disciplinary action relating to the Wage Loss Form, Officer Sharpe had his police powers restored. In 2018, Officer Sharpe applied for transfers

to PGCPD's Homeland Security Division and Criminal Investigations Division. Officer Sharpe was selected for an interview for the Homeland Security position. The combined score from his four-person panel interview placed Officer Sharpe seventh out of approximately 20 applicants. Typically, the interview rankings are then passed on to the hiring unit supervisor for input. Officer Sharpe received a recommendation from Sgt. Adam Doyle, a supervisor in the Vice Intelligence Unit of the Homeland Security Division, with whom Officer Sharpe had once had a two-week detail. Ultimately, Major Grant, who by then was Deputy Chief, offered the position to Officer Hajar Martin, an African American woman who was ranked sixth after the interviews and who was selected in part because the unit needed more female officers for particular undercover assignments. As for the Criminal Investigations Division position, Officer Sharpe was selected for an interview but, by his own admission, "bombed" it and thus was not selected for the position. J.R. 21.

## VI.    Federal Funding

In the past 10 years, PGCPD has received three federal grants, including a U.S. Department of Justice Community Oriented Policing Services ("COPS") grant, which provided funding for the hiring of 50 new officers. The COPS grant began in 2009 and as of 2015 was still funding the employment of eight officers.

## VII.    Equal Employment Opportunity Activity

On January 6, 2016, Officer Sharpe was interviewed by IAD as part of its investigation into Sgt. Rush's texting of the *Lean on Me* video. In that interview, he complained about what he perceived to be racial disparities in how work was assigned in the District III RST as well as broader racial tensions in the PGCPD. In response to Officer Sharpe's comments, Cpl. Julie Valdez, the IAD investigator, asked Officer Sharpe if he wanted to file a complaint with the United

17

States Equal Employment Opportunity Commission ("EEOC") and informed him that IAD would help prepare him to do so. Officer Sharpe then asked questions about potential repercussions from filing an EEOC complaint, and Cpl. Valdez assured him that there should not be any and that the PGCPD took such issues seriously. Officer Sharpe then expressed his hope that IAD would speak with certain officers because "guys are hurting." J.R. 100. At Cpl. Valdez's request, Officer Sharpe provided the names of several officers to whom she should speak.

On March 15, 2016, Officer Sharpe filed a Charge of Discrimination ("the First Charge") with the EEOC, alleging race discrimination and retaliation stemming from his January 2016 transfer out of District III RST to District III Patrol. On June 15, 2016, the EEOC issued Officer Sharpe a notice that the investigation was complete and that he was authorized to file suit, commonly referred to as a right-to-sue letter.

On March 22, 2017, Officer Sharpe filed a second EEOC Charge of Discrimination ("the Second Charge"), alleging race discrimination based on the recommended discipline of termination in his IAD investigation relating to the Wage Loss Form, which he asserted was disproportionate compared to discipline imposed on white officers. On the EEOC form, Officer Sharpe did not check the box for Retaliation. In later filings with the EEOC on the Second Charge, in response to requests for information about possible retaliatory personnel actions, Officer Sharpe listed his February 5, 2016 suspension as having occurred after the First Charge, and his February 9, 2017 demotion as having occurred before the Second Charge. The EEOC issued Officer Sharpe a right-to-sue letter on the Second Charge on September 28, 2017. On December 26, 2017, Officer Sharpe filed his original Complaint in this Court.

**DISCUSSION**

In his October 22, 2018 Amended Complaint, Officer Sharpe asserts three causes of action: (1) race discrimination in violation of Title VII, based on the allegedly discriminatory discipline following the IAD investigation relating to the Wage Loss Form ("the Disciplinary Action"), the 2016 involuntary transfer from RST to Patrol ("the 2016 Transfer"), his lower performance evaluation in 2016 ("the 2016 Performance Evaluation"), and the denials of his 2018 applications seeking transfers to the Homeland Security Division and the Criminal Investigations Division ("the 2018 Transfer Applications"); (2) retaliation in violation of Title VII, based on the various adverse actions that were taken against him following his January 2016 statements to an IAD investigator opposing discrimination and his filing of the EEOC Charges; and (3) race discrimination and retaliation in violation of Title VI, based on the same incidents. The County has filed a Motion for Summary Judgment on all of Officer Sharpe's claims, arguing that (1) as to his Title VII claims, Officer Sharpe failed to exhaust administrative remedies on certain alleged instances of discrimination and retaliation; (2) as to the remaining race discrimination claims, they are not based on adverse employment actions actionable under Title VII, the discriminatory discipline claims are not supported by an adequate comparator, and the County has established legitimate, non-discriminatory reasons for its actions; and (3) on the retaliation claims, Officer Sharpe has failed to establish materially adverse actions, causation, or both.

**I.    Legal Standard**

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most

favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## II.    Exhaustion of Administrative Remedies

As a threshold issue, the County argues that certain Title VII claims must be dismissed because Officer Sharpe did not properly exhaust administrative remedies. Discrimination claims under Title VII are subject to an administrative exhaustion requirement. *See* 42 U.S.C. § 2000e-5(f)(1). Among the exhaustion requirements are that a plaintiff must first file a charge with the EEOC within 300 days of the allegedly discriminatory conduct. *See* 42 U.S.C. § 2000e-5(e)(1), 5(f)(1). This EEOC charge "defines the scope of [the plaintiff's] subsequent right to institute a civil suit." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000) (citation omitted). If a plaintiff fails to include a claim in the EEOC charge, the plaintiff may later assert it in federal court only if it is "reasonably related to [the] EEOC charge and can be expected to follow from a reasonable administrative investigation." *Id.* In addition, Title VII requires that any civil action under federal law must be filed within 90 days after the plaintiff receives a right-to-sue letter from the EEOC. 42 U.S.C. § 2000e–5(f)(1). Contrary to the County's claim, the issue of administrative exhaustion is not jurisdictional, but if a defendant raises exhaustion as an affirmative defense and the record establishes that the plaintiff has failed to comply with the applicable administrative

procedures, the defendant is entitled to dismissal or summary judgment on the unexhausted claims. *See Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1848, 1851 (2019).

Because Title VI claims are not subject to an administrative exhaustion requirement, the Court will not grant summary judgment on any of the Title VI claims based on the failure to exhaust. *See e.g., Freed v. Consol. Rail Corp.*, 201 F.3d 188, 193–94 (3d Cir. 2000) (noting that "nothing in the language of [Title VI] requires administrative exhaustion").

### A.    2016 Transfer

Officer Sharpe's First Charge, filed on March 15, 2016, alleged race discrimination and retaliation relating to the 2016 Transfer from the District III RST to District III Patrol. The County asserts that Officer Sharpe's Title VII claims based on this personnel action should be dismissed because he did not file suit within 90 days of receiving his right-to-sue letter on the First Charge. The record establishes that these claims are untimely. Officer Sharpe received his right-to-sue letter on the First Charge on June 15, 2016, but he did not file suit in this Court until December 26, 2017, long after the 90-day period expired. The County is thus entitled to summary judgment on those Title VII race discrimination and retaliation claims. Nevertheless, the events leading up to the 2016 transfer out of RST may still be relevant to other claims in this case. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002).

### B.    2016 Performance Evaluation and 2018 Transfer Application

The County also alleges a failure to exhaust administrative remedies relating to any Title VII discrimination and retaliation claims based on the November 2016 Performance Evaluation and the denials of the 2018 Transfer Applications. These actions were not the subject of either the First or Second Charges, and the denials of the 2018 Transfer Applications in fact occurred after the filing of the Second Charge on March 22, 2017. As these were separate decisions not directly

21

related to the subject matter of the First and Second Charges, consisting of the 2016 Transfer and the Disciplinary Action, respectively, any Title VII race discrimination claims relating to the 2016 Performance Evaluation or the 2018 Transfer Applications will be dismissed for failure to exhaust administrative remedies. *See Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005) ("Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." (citation omitted)).

Unlike a discrimination claim, a retaliation claim may be alleged for the first time in federal court if it alleges retaliation for the filing of an EEOC charge. *Jones v. Calvert Group*, 551 F.3d 297, 302 (4th Cir. 2009), *abrogated on other grounds by Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1846, 1849–51 (2019). This exception to the exhaustion requirement applies only if the alleged retaliation relates to the filing of the EEOC charge underlying the federal complaint. *See id.* at 304 (finding that a retaliation claim did not need to be exhausted where it could be construed as relating to retaliation for the filing of a second EEOC charge, which gave rise to the federal complaint). Here, because Officer Sharpe's retaliation claim based on the 2016 Performance Evaluation is most fairly construed to assert that the negative evaluation was given in retaliation for the filing of the First EEOC Charge, filed on March 15, 2016, it did not need to be exhausted. *Id.*

To the extent that the County argues that Officer Sharpe was expressly required to include such a retaliation claim in his Second Charge, the County cites no authority imposing a requirement that, in cases with multiple EEOC charges, follow-on retaliation claims must be exhausted through subsequent charges relating to different events. Such a rule would run contrary to a key rationale behind the exception to the exhaustion requirement for retaliation claims, namely the "practical

concern[]" that "a plaintiff that has already been retaliated against one time for filing an EEOC charge will naturally be reluctant to file a separate charge, possibly bringing about further retaliation." *Jones*, 551 F.3d at 302.

For the same reasons, the Title VII retaliation claims based on the 2018 Transfer Applications did not have to be exhausted, as they are fairly construed to be based on the claim that the decisions were made in retaliation for the filing of either the First Charge in March 2016 or the Second Charge in March 2017. *See Jones*, 551 F.3d at 304.

## III.    Race Discrimination

The County argues that the Court should grant summary judgment on Officer Sharpe's race discrimination claims under both Title VII and Title VI because the record evidence is insufficient to support those claims.   These claims include (1) a claim of disparate treatment based on discriminatory discipline, on the grounds that the Disciplinary Action based on the Wage Loss Form was more severe than the discipline imposed against white officers for similar violations; and (2) other claims of disparate treatment, relating to the 2016 Transfer, the 2016 Performance Evaluation, and the 2018 Transfer Applications.

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VI prohibits "any program or activity receiving Federal financial assistance" from discriminating against any person "on the ground of race, color, or national origin." 42 U.S.C. § 2000d. To evaluate employment discrimination claims under either statute, courts consider direct or circumstantial evidence of discriminatory intent presented by the plaintiff, or they apply the burden-shifting analysis outlined in *McDonnell Douglas Corporation*

23

*v. Green*, 411 U.S. 792 (1973). *See Adams v. Trs. of the Univ. of N.C.–Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011); *Middlebrooks v. Univ. of Maryland*, 166 F.3d 1209 (4th Cir. 1999) (unpublished table decision), 1999 WL 7860, at * 4 (stating that Title VI claims "are appropriately analyzed under the Title VII proof scheme, first articulated in *McDonnell Douglas*"). Under the *McDonnell Douglas* framework, the burden is first on the plaintiff to establish a *prima facie* case of discrimination. *Adams,* 640 F.3d at 558. Upon such a showing, the burden shifts to the employer to assert a "legitimate, nondiscriminatory reason" for the allegedly discriminatory conduct. *Id.* (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)). If the employer makes that showing, the burden shifts back to the plaintiff to demonstrate that the employer's purported reasons are a "pretext for discrimination" *Id.* at 558–59 (quoting *Hill*, 354 F.3d at 285).

To establish a *prima facie* claim for race discrimination based on disparate treatment or discriminatory discipline, a plaintiff must present facts demonstrating: (1) the plaintiff's membership in a protected class; (2) the plaintiff's satisfactory job performance; (3) that the plaintiff was subjected to an adverse employment action; and (4) that similarly situated employees outside the protected class received more favorable treatment. *White v. BFI Waste Svcs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004). When the race discrimination is based on a failure to hire for a position, whether as a new position, a promotion, or a transfer to a position with higher pay, the fourth element is that the person actually selected for the position was from outside the protected class, or that there were other circumstances "giving rise to an inference of unlawful discrimination." *See Carter v. Ball*, 33 F.3d 450, 458–59 (4th Cir. 1994).

### A.     Discriminatory Discipline

Officer Sharpe's primary race discrimination claim is that he was subjected to discriminatory discipline when he was investigated, charged, and disciplined for his completion of the Wage Loss Form, resulting in a demotion, two suspensions without pay, and removal from the promotional cycle for one year.  There is no dispute that Officer Sharpe has presented sufficient evidence to establish the first three elements of a *prima facie* case:  that he is a member of a protected class, that he was performing his job satisfactorily, and that he was subjected to an adverse employment action.  The dispute centers only on whether the evidence is sufficient to show, or at least create a genuine issue of material fact whether, comparator employees outside the protected class were treated more favorably.

Officer Sharpe has identified 19 comparators, including Sgt. Rush, Cpl. Denault, and Cpl. Rickert.  In assessing whether there is a proper comparator group, "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful."  *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008).  That showing typically includes evidence that the employees "dealt with the same supervisor ... [were] subject to the same standards[,] and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct."  *Hurst v. Dist. of Columbia*, 681 F. App'x 186, 191 (4th Cir. 2017) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).  "Overall, the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other *prima facie* evidence, would allow a jury to reach an inference of discrimination."  *Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017) (quoting *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011)).  "The most important

variables in the disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses committed and the nature of the punishments imposed." *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985).

Here, the Court finds that Cpl. Rickert is a proper comparator. Cpl. Rickert and Officer Sharpe were each investigated by IAD for similar conduct: inaccurately reporting their hours. Cpl. Rickert's supervisor, Sgt. Robinson, had been advised that Cpl. Rickert had a history of inaccurate reporting, specifically, working part-time jobs while still on the clock for his patrol shift and altering his recorded work schedule to prevent any appearance of overlap. The particular incident that prompted the 2017 IAD investigation of Cpl. Rickert involved his attempts to alter the recorded work hours for both his PGCPD patrol shift and his shift for his part-time job at PGH on March 30 and 31, 2017. Although he was scheduled to work his PGCPD shift at the firearms range from 3:00 p.m. to 1:00 a.m., he actually only worked for PGCPD from approximately 3:00 p.m. to 10:30 p.m. Instead, he arrived at PGH at approximately 10:45 p.m. for his outside job, to work on a shift that officially began at 9:00 p.m.—before he actually arrived at PGH—and ran until 5:00 a.m.

Cpl. Rickert then changed the work schedule records to show that his PGCPD shift was from 11:00 a.m. to 9:00 p.m. to avoid overlapping hours, but Sgt. Robinson discovered the altered records and changed the hours back. Cpl. Rickert then went to PGH and arranged to have its records altered to show that he worked there from 1:00 a.m. to 6:00 a.m., to avoid overlap with his official PGCPD hours for that evening. Cpl. Rickert's PGCPD records thus falsely state that he worked for PGCPD until 1:00 a.m. when he left at 10:30 p.m., and his PGH records falsely state that he started his shift at 1:00 a.m., when he actually arrived at 10:45 p.m. Effectively, then, Cpl.

Rickert was paid by PGCPD for the time from 10:30 p.m. to 1:00 a.m. when he was actually working for PGH.

Cpl. Rickert and Officer Sharpe were thus each investigated for preparing and submitting records with false statements about the specific hours they worked for PGCPD, in order to receive pay to which they were not entitled.  Officer Sharpe falsely stated in the Wage Loss Form that he was not paid for the period from October 15, 2014 to October 31, 2014, while Rickert falsely stated in his altered work schedule record entry that he worked an ten-hour shift for PGCPD from 11:00 a.m. to 9:00 p.m., when he actually only worked from 3:00 p.m. to 10:30 p.m., and also falsely stated in his PGH records that he worked there from 1:00 a.m. to 6:00 a.m., when he started at 10:45 p.m.  While Officer Sharpe did not personally submit the Wage Loss Form to Progressive, Cpl. Rickert personally changed his PGCPD shift hours and arranged for the change to his PGH hours.  Particularly where both incidents involve alleged misrepresentations of facts relating to work hours, the Court finds that there are sufficient similarities between these incidents to make Cpl. Rickert an appropriate comparator.  *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976) (noting that "precise equivalence in culpability between employees is not the ultimate question," and that the question is instead whether employees are involved in acts of "comparable seriousness").

While the facts underlying these two disciplinary actions have much in common, the charges filed and discipline imposed were vastly different.  In Cpl. Rickert's case, the most serious violation alleged was for a Misrepresentation of Facts, which is a violation of Prince George's County law, and the only violations sustained were for Integrity and Compliance with an Order from Superior Authority, which are violations of the PGCPD General Orders.  The discipline imposed was that Cpl. Rickert was suspended without pay for two days and fined $250.

27

In contrast, in Officer Sharpe's case, although Sgt. Rubin found no basis for False Statement or Misrepresentation of Facts charges, those allegations, for violations of County law, were added to Officer Sharpe's final disciplinary recommendation over Sgt. Rubin's objection. A False Statement charge carries a potential penalty of termination. Not only were those charges sustained, but Chief Stawinski recommended termination, and the final discipline consisted of demotion, two suspensions without pay, and removal from the promotional cycle for one year. Further, because of the pending charges, while Cpl. Rickert was actually promoted to Sergeant during the pendency of his IAD investigation, Officer Sharpe was not eligible for promotion during the three-year investigation and thus was not promoted to corporal when he passed the examination in May 2015. While there are, as always, distinctions that can be drawn between the underlying facts and the reasons for the particular discipline imposed, the evidence is more than sufficient to establish a plausible disparity between similarly situated individuals, one of whom is a member of the protected class and one of whom is not. *See Moore*, 754 F.2d at 1105.

Similarly, the Court finds that Cpl. Denault is a proper comparator as to the incident in which he made false or misleading statements when he asserted that he was self-employed and did not state that he was a police officer. Although Cpl. Denault's alleged false statements and misrepresentations of fact did not relate to work hours, they were arguably more serious because they were made in court, to a judge, during testimony under oath, while Officer Sharpe's incident involved a written false statement that he did not even sign or personally submit as part of a claim. Cpl. Denault was charged with a False Statement, but the charge was downgraded to a Misrepresentation of Fact, and the discipline was limited to suspension without pay for 10 hours. Cpl. Denault was even promoted to Sergeant while the investigation was ongoing. Having identified two valid comparators, the Court need not, and does not, address whether any of the

28

other proposed comparators are sufficiently similar to support the claim of discriminatory discipline.

Although the County generally asserts that there are legitimate, non-discriminatory reasons for the disparate discipline, centering on differences between the comparator incidents and Officer Sharpe's incident, under these facts, the question whether the disparate discipline is the result of factual differences in the incidents or is based on race discrimination is properly left to a jury. Where Officer Sharpe has provided evidence sufficient to establish a genuine issue of material fact on whether he was subjected to racially discriminatory discipline, the Motion will be denied on this claim.

### B.    Remaining Discrimination Claims

The County also seeks summary judgment on Officer Sharpe's remaining Title VI race discrimination claims. These claims consist of alleged race discrimination in (1) the 2016 Transfer; (2) the 2016 Performance Evaluation; and (3) the 2018 Transfer Applications.

On the question of whether there is a *prima facie* case on these claims, there is no dispute that Officer Sharpe is a member of a protected class. Other than for the 2016 Transfer, there is no dispute that Officer Sharpe was performing his job satisfactorily. The primary questions to consider are whether the allegedly discriminatory actions qualify as adverse employment actions, and whether the record evidence is sufficient to establish at least a genuine issue of material fact on disparate treatment based on race.

In the context of discrimination claims, "[a]n adverse employment action is a discriminatory act that 'adversely affects the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). Examples of adverse

employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999). Accordingly, actions that do not cause a "decrease in compensation, job title, level of responsibility, or opportunity for promotion" ordinarily do not constitute adverse employment actions under Title VII. *Id.* at 256–257.

### 1.    2016 Transfer

On Officer Sharpe's claim of race discrimination in the 2016 Transfer from District III RST to District III Patrol, the County asserts that Officer Sharpe has not established a *prima facie* case because the transfer is not an adverse employment action and Officer Sharpe has not established that he was performing his job satisfactorily. Generally, the "mere denial of a reassignment to a purely lateral position … is typically not a materially adverse action." *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 709 (5th Cir. 2016) (evaluating a Title VII retaliation claim under the applicable lower standard for retaliation claims). However, a lateral transfer can be an adverse employment action if the transfer would result in higher or lower pay or benefits. *See, e.g., Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012). That is the situation here. Officer Sharpe provided uncontroverted deposition testimony, corroborated by the declaration of Lt. Perez, that investigative positions come with significant opportunities for overtime, which could result in higher overall pay than he could attain in Patrol. *See Boone*, 178 F.3d at 256–57 (defining adverse employment actions to include "a decrease in pay or benefits" and stating that a reassignment without "a decrease in compensation" or other changes to the terms and conditions would not qualify); *cf. Burlington Indus. v. Ellerth*, 524 U.S. 742, 762 (1998) (stating, in the context of analyzing employer liability for a hostile work environment under Title VII, that "[a] tangible employment action in most cases inflicts direct

30

economic harm"). The record thus supports the inference that Officer Sharpe's transfer out of RST, an investigative position, to Patrol resulted in a decrease in pay, such that the 2016 Transfer was an adverse employment action. *Boone*, 178 F.3d at 255.

As for whether Officer Sharpe was performing his job satisfactorily at the time of the January 2016 Transfer, there is, at a minimum, a genuine issue of material fact. While Sgt. Soden's December 2015 email to Lt. Mrotek details "quarrelsome behaviors" on Officer Sharpe's part, the email also calls Officer Sharpe a "more than capable investigator," and it was drafted just one month after Officer Sharpe's November 2015 overall "Outstanding" performance evaluation, which was completed by Sgt. Soden. J.R. 150. Whether events in the short time between Officer Sharpe's performance evaluation and his transfer out of District III RST were enough to render Officer Sharpe's performance unsatisfactory is an issue for a jury. *See Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 244 (4th Cir. 1982) (noting that to make the requisite showing of satisfactory job performance, a plaintiff must produce evidence of satisfactory performance at a "time reasonably close to the time of the challenged employer action").

As for the final element of a *prima facie* case, Officer Sharpe, however, has not shown that he was treated differently from similarly situated officers. Though he has acknowledged that he was transferred because of disagreements and confrontations with the 9-car officer, Det. Wormuth, he has not identified a similarly situated white officer with comparable conduct who was not transferred out. As for evidence of circumstances giving rise to discriminatory intent, he points only to his assertion that Sgt. Rush, a previous 9-car officer in the unit, had sent the *Lean on Me* video and appeared to have given favorable assignments to white officers such as Det. Wormuth. He did not identify any facts showing that Det. Wormuth acted with discriminatory intent.

Even if Officer Sharpe could be deemed to have established a *prima facie* case, the burden then shifts to the County to provide a legitimate, non-discriminatory reason for the transfer. In Sgt. Soden's December 2015 email recommendation, he concluded that Officer Sharpe needed to be transferred not because he lacked the skills necessary to be an effective investigator, but rather because the discord between him other officers, particularly the "9-car" assistant supervisors, Cpl. Miller and Det. Wormuth, affected Sgt. Soden's team-building efforts for the unit. Although Officer Sharpe has asserted that he was in the right in the incident involving the alleged robbery victim, and that when he was seen sitting in the police station with headphones he was actually working by reviewing recorded evidence, he does not dispute that he had multiple conflicts with Det. Wormuth and other members of the District III RST to the extent that, on more than one occasion, those conflicts ended up affecting the work environment, whether because Officer Sharpe refused to do assignments that he felt were unnecessary or unfair or because the conflicts led to disagreements in front of members of the public. Such incidents constitute a legitimate, non-discriminatory reason for Sgt. Soden's proposed transfer.

As for whether there is sufficient evidence to show that these reasons were a pretext for discrimination, Officer Sharpe has asserted only that Det. Wormuth and Sgt. Rush gave false accounts about him, and that when he was the 9-car officer, Sgt. Rush had given preferential treatment to white officers, including Det. Wormuth. Even accepting, as the Court must at this stage, Officer Sharpe's version of these events, there is no evidence that Sgt. Soden received or considered in his decision any information from Sgt. Rush, who was no longer the 9-car officer at the time of these events. There is also no evidence that Det. Wormuth had previously exhibited racially discriminatory intent or that his complaints about Officer Sharpe's conduct was motivated by discriminatory intent. More importantly, there is no evidence that Sgt. Soden was aware of any

racial motivation on the part of Det. Wormuth, or that Sgt. Soden himself acted with discriminatory intent. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010) (stating that in cases involving adverse employment actions, "[i]t is the decision maker's intent that remains crucial"). In turn, the evidence is also insufficient to support a finding that at the time of these events, Det. Wormuth was a supervisor who was not the formal decisionmaker but took actions that were "motivated by [discriminatory] animus" and "*intended . . .* to cause an adverse employment action," and that his actions "were a proximate cause of the ultimate employment action." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 & n.3 (2011) (identifying the factors necessary to impute discriminatory animus from one supervisor to the formal decisionmaker).

Significantly, though Sgt. Soden arguably was the *de facto* decisionmaker, the final decisions relating to the transfer were made several levels above him. There is no evidence that Lt. Mrotek, who concurred in Sgt. Soden's recommendation, had any discriminatory intent. The record does not establish who actually made the decision that Officer Sharpe would be sent to Patrol as opposed to another investigative unit, or when that determination was made. Under these circumstances, the Court finds that the evidence is not sufficient to support a claim that the transfer decision, as opposed to other discrete acts by individual officers in District III RST, was motivated by race discrimination. The Court will therefore grant summary judgment to the County on Officer Sharpe's Title VI race discrimination claim based on the 2016 Transfer.

Nevertheless, because the events surrounding the 2016 Transfer, particularly the final decision to send Sharpe to Patrol, were occurring in the same time frame as the Disciplinary Action, these events may provide relevant evidence on the claims of discriminatory discipline and retaliation based on the Disciplinary Action.

2.    **2016 Performance Evaluation**

In asserting a race discrimination claim relating to the 2016 Performance Evaluation, Officer Sharpe argues that the lower scores he received as compared to his 2015 evaluation, including the downgrading of his rating from "Outstanding" to "Exceeds Satisfactory" and the reduction of his numerical score from 3.95 to 2.75, were racially motivated. This claim fails because the November 2016 Performance Evaluation does not constitute an "adverse employment action," as required to support an employment discrimination claim.

"A downgrade of a performance evaluation *could* affect a term, condition, or benefit of employment if it has a tangible effect on the terms or conditions of employment," but "a poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004); *see Dortch v. Cellco P'ship*, 770 F. App'x 643, 647 (4th Cir. 2019); *see also Jensen-Graf v. Chesapeake Emp'rs' Ins. Co.*, 616 F. App'x 596, 598 (4th Cir. 2015) (finding that the plaintiff had failed to state a plausible discrimination claim where the alleged adverse employment action was being placed on a "performance improvement plan," but she was not demoted, passed over for promotion, or given a pay reduction).

Here, while Officer Sharpe identifies a clear downgrade in his performance rating and has generally asserted that it "reasonably would raise a 'red flag' when [Officer Sharpe] competed for promotional opportunities," Opp'n at 20, ECF No. 100, he has not identified any evidence of a tangible, adverse effect from that downgrade. The record reveals no effort on the part of Officer Sharpe to transfer or otherwise alter his position with PGCPD during 2017. Although he submitted the two 2018 Transfer Applications, his performance evaluation is not automatically considered in

34

the transfer process, and there is no evidence that it was actually considered in the decisions on the 2018 Transfer Applications. The Court therefore does not find sufficient evidence upon which to conclude that the 2016 Performance Evaluation was an adverse employment action. *See James*, 368 F.3d at 378 (finding that a negative performance evaluation was not an adverse employment action where the plaintiff's "claim that this evaluation took him off track for promotion and formed a basis for denying him opportunities" was "conjectural"). The County will thus be granted summary judgment on the race discrimination claim based on the 2016 Performance Evaluation.

### 3.    2018 Transfer Applications

Officer Sharpe also alleges race discrimination in the denial of his two 2018 Transfer Applications, one for a position in the Homeland Security Division and the other for a position in the Criminal Investigations Division. As discussed above, because a transfer between Patrol and one of these investigative divisions can result in a pay differential based on overtime opportunities, *see supra* part III.B.1, there is at least a genuine issue of material fact on whether the denials of the 2018 Transfer Applications constituted adverse employment actions.

Nevertheless, Officer Sharpe's discrimination claims based on the 2018 Transfer Applications fail because there is insufficient evidence to support the last element of a *prima facie* case, that the position was filled by an individual outside the protected class. *Carter*, 33 F.3d at 458–59. On the Homeland Security transfer application, the position was filled by Officer Martin, who is African American, and is thus also a member of the protected class. *See Edmond v. Univ. of Miami*, 441 F. App'x 721, 724 (11th Cir. 2011) (finding that the plaintiff had failed to satisfy the fourth element of his disparate treatment race and national origin discrimination claims because the plaintiff's identified comparator was a woman who "although employed in the same job" as the plaintiff "also share[d] his race and national origin"). Even if this element were satisfied, the

County has provided evidence of a legitimate, non-discriminatory reason that Officer Martin was hired instead of Officer Sharpe: a gender disparity in the Homeland Security Vice Unit and a need for a female officer to conduct undercover assignments requiring a woman. Officer Sharpe makes no argument, and provides no evidence, that this reason was pretextual.

As for the 2018 Criminal Investigative Division position, Officer Sharpe offers no evidence, and the record does not appear to contain any, that the officer selected for the position was outside of the protected class. Even if Officer Sharpe had provided such evidence, the County has presented unrebutted evidence of a legitimate, nondiscriminatory reason for its decision not to hire Officer Sharpe: his own admission that he "bombed" the interview. J.R. 21.

The Court will therefore grant summary judgment to the County on Officer Sharpe's race discrimination claims relating to his 2016 Transfer, the 2016 Performance Evaluation, and the 2018 Transfer Applications.

## IV.   Retaliation

The County also seeks summary judgment on the remaining Title VII and Title VI retaliation claims relating to (1) the Disciplinary Action; (2) the 2016 Transfer; (3) the 2016 Performance Evaluation; and (4) the 2018 Transfer Applications. A retaliation claim may be established through a burden-shifting framework analogous to the discrimination framework set forth in *McDonnell Douglas*. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Under this approach, the plaintiff must show that the adverse action would not have occurred in the absence of the employer's retaliatory animus, such that retaliation was the "real reason" for the action. *Id.* at 251–52. As to the burden-shifting analysis:

> A plaintiff bears the initial burden of establishing a prima facie case of retaliation. Once this burden is carried, the burden shifts to the defendant, who is obliged to articulate a legitimate, non-retaliatory justification for the adverse employment action. If the defendant carries this burden, the onus is on the plaintiff to then

36

demonstrate that the non-retaliatory reason advanced by the defendant is a mere pretext.

*EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (internal citations omitted);

*cf. McDonnell Douglas*, 411 U.S. at 802–04.

To establish a prima facie case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) there was a causal link between the two events. *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015); *see Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003) (setting forth the same elements for a Title VI retaliation claim).

## A.    Protected Activity

Here, there is no dispute that Officer Sharpe engaged in protected activity by filing his First and Second Charges.  Officer Sharpe's January 2016 interview with IAD in connection with the Sgt. Rush *Lean on Me* video investigation, in which he had an extended conversation about the need for the PGCPD to address alleged race discrimination and discussed the possibility of filing an EEOC complaint, also constituted protected activity as it was a clear statement of opposition to discrimination. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (stating that protected activity "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities").

## B.    Materially Adverse Action

On the second element, for a retaliation claim, a "materially adverse" action is one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  It need not meet the more stringent definition of an "adverse employment action" required for a discrimination

claim. *See id.* at 64 (holding that "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment").

Each of the alleged incidents of retaliation meet this standard. The Disciplinary Action, which resulted in a demotion, suspensions without pay, and disqualification from promotion for one year, was plainly a materially adverse action, as were the 2016 Transfer and the unsuccessful 2018 Transfer Applications, for the reasons set forth above. *See supra* III.A, B.1, B.3. Under the more liberal standard for retaliation claims, Officer Sharpe's 2016 Performance Evaluation is also a materially adverse action. For purposes of a retaliation claim, a lower performance evaluation in and of itself can arguably dissuade a worker from engaging in protected activity. *See Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 433 (6th Cir. 2007) (finding that under the *Burlington Northern* standard, lower performance evaluation scores could constitute a materially adverse action); *cf. Williams v. Prince William Cty.*, 645 F. App'x 243, 245 (4th Cir. 2016) (finding that actions that included the inclusion of "unattainable goals" in a performance evaluation would have dissuaded a reasonable employee from making or supporting a charge of discrimination).

## C.    Causation

As for causation, this element must be established at two stages of the *McDonnell Douglas* framework: first, in making a *prima facie* case, and second, in proving pretext and satisfying the ultimate burden of persuasion. *Foster*, 787 F.3d at 250. At the *prima facie* stage, the causation element is less onerous and may be met simply by showing some temporal proximity between when the protected activity took place and when the employee was subjected to a materially adverse action. *See Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) ("Appellant's proof of a causal connection between the protected activity and her discharge essentially was that she was fired after her employer became aware that she had filed a discrimination charge. While this proof

far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality."). To meet the ultimate burden of establishing causation, there must be sufficient evidence to support an inference that retaliation was the "real reason for the challenged conduct." *Foster*, 787 F.3d at 250–51 (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)). In considering whether such evidence exists, courts should consider that "[s]ince, by definition, an employer cannot take action because of a factor of which it is unaware, an employer's knowledge that the plaintiff engaged in protected activity is absolutely necessary to establish [the causation element]." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

The evidence is more than sufficient to support a causal link between protected activity and the Disciplinary Action on the Wage Loss Form. Officer Sharpe's January 16, 2016 meeting with an IAD investigator about the Sgt. Rush investigation included an extensive discussion about racial inequalities in the police department and included an exchange about filing an EEOC complaint and the possible repercussions of doing so. Just two weeks later, on February 1, 2016, Major Grant, who was part of IAD, issued the final recommendation in Officer Sharpe's case, which departed dramatically from Sgt. Rubin's initial recommendation by adding the more severe charges of False Statement and Misrepresentation of Facts, charges that Sgt. Rubin had refused to add out of a belief that they were unsubstantiated. That far more severe recommendation made its way swiftly to Chief Stawinski, who only four days later adopted the recommendation and proposed the severe sanction of termination. The final Disciplinary Action, which included demotion, suspensions without pay, and removal from the promotional cycle for one year, resulted in discipline significantly more severe than what would have been likely had the charges matched Sgt. Rubin's initial recommendations. Where the initial and final IAD reports were starkly at odds,

and the far more severe recommendation was issued mere weeks after Officer Sharpe opposed race discrimination during the course of an IAD investigation and discussed the possibility of filing an EEOC claim with an IAD investigator, a reasonable jury could plausibly conclude that the decisionmakers recommending and imposing the discipline were aware of Officer Sharpe's protected activity and were acting in response to it. The Motion will therefore be denied as to Officer Sharpe's retaliation claim based on the Disciplinary Action.

As for the other incidents of alleged retaliation, the evidence is insufficient to support a finding of causation. The 2016 Transfer was first recommended by Sgt. Soden in December 2015, before Officer Sharpe's first protected activity during his IAD interview in January 2016. Because Sgt. Soden formulated this recommendation before any protected activity had occurred and thus necessarily had no knowledge of any protected activity at that time, the evidence does not support a finding of causation. *See Dowe*, 145 F.3d at 657. Though the 2016 Performance Evaluation occurred approximately 10 months after Officer Sharpe's January 2016 statements about discrimination to IAD and eight months after the filing of the First Charge in March 2016, to the extent that there were no earlier opportunities for retaliation, the temporal gap does not necessarily preclude a finding of causation. *See Price*, 380 F.3d at 213 (stating that an employer's knowledge of protected activity "coupled with adverse action taken at the first opportunity" is sufficient to establish a *prima facie* case of causation). Nevertheless, Officer Sharpe has not established causation because the 2016 Performance Evaluation was issued by Sgt. Benjamin, Officer Sharpe's supervisor in Division III Patrol. Where the January 2016 protected activity was directed to IAD, and the First Charge alleged discrimination in Division III RST, there is no evidence that Sgt. Benjamin, the supervisor of a unit about which Officer Sharpe levies no complaints of race

discrimination or racial tension and which was not the subject of either of his EEOC Charges, was aware of any protected activity by Officer Sharpe at the time of the evaluation.

Finally, as to the 2018 Transfer Applications, as discussed above, the County has presented evidence of legitimate non-discriminatory and non-retaliatory reasons for the decisions. The person selected for the Homeland Security Division position scored higher at the interview stage and was a woman needed to meet a need for female undercover officers in the squad, and Officer Sharpe himself acknowledged that he had performed poorly at the Criminal Investigations Division interview. Where Officer Sharpe has not presented evidence sufficient to refute these non-retaliatory reasons and to support a finding that they were pretextual, the Court finds no genuine issue of material fact on these retaliation claims. The Court will therefore grant the Motion on all of the retaliation claims except the claim relating to the Disciplinary Action.

## V.      Title VI Federal Funding

The County argues that the Title VI claims fail because there is insufficient evidence to establish the element of federal funding. A plaintiff can prevail on a Title VI claim for employment discrimination only upon a showing that the employer receives federal funding and that "a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. 2000d-3; *see Venkatraman v. REI Systems, Inc.,* 417 F.3d 418, 420–21 (4th Cir. 2005) (listing as one of the elements of a Title VI claim of employment discrimination that "providing employment is a primary objective of the federal aid" that the employer receives).

The record establishes that while Officer Sharpe was under the IAD investigation, PGCPD was receiving a federal COPS grant, a primary purpose of which was to enable the hiring of 50 community patrol officers. The County argues, without citing legal authority, that such evidence is insufficient because it does not establish that Officer Sharpe's particular position was paid for

41

by the federal funding. The plain language of the statutory requirement that "a primary objective" of the federal funding "is to provide employment," does not impose any requirement that the federal funding actually pay for the plaintiff's salary or wages. *See* 42 U.S.C. 2000d-3; *Venkatraman*, 417 F.3d at 420–21. Thus "[t]here is no requirement that [a] plaintiff plead that he was an intended beneficiary of the federally funded program in which [the] defendants are alleged to have participated." *Rogers v. Bd. of Educ. of Prince George's Cty.*, 859 F. Supp. 2d 742, 750–51 n.7 (D. Md. 2012) (citation omitted). Because the COPS grant had the employment of police officers as a primary purpose, and in fact was used to fund 50 PGCPD officers, the evidence is sufficient to meet this element. *See id.* (stating that federal funding distributed for non-employment purposes that "might require hiring individuals to carry out those goals" is insufficient to satisfy this element). The Motion will be denied on this argument.

## VIII. Proper Defendant

Lastly, the County makes a brief argument that Officer Sharpe's claims should be dismissed because his Amended Complaint names as the Defendant in this action the "Prince George's County Government," which is not a legal entity capable of being sued. In response, Officer Sharpe notes that in his Amended Complaint, he expressly alleged that the named Defendant was "a proper party to this action," Am. Compl. ¶ 5, ECF No. 21, and that in the Answer, the County admitted the truth of those allegations, Ans. ¶ 5, ECF No. 23.

There is no dispute that Prince George's County, Maryland is a proper Defendant, and though the addition of the term "Government" creates some ambiguity, in the context of the allegations describing the named Defendant as a "municipality, corporate body politic organized and existing under the laws of the State of Maryland," the term "Government" is most fairly

construed to be descriptive rather than part of the legal name of the identified Defendant.  Am. Compl. ¶ 5.

Although Defendant references a lack of jurisdiction, this Court plainly has subject matter jurisdiction under 28 U.S.C. § 1331, and any claim of lack of personal jurisdiction is long since waived.  *See* Fed. R. Civ. P. 12(h).  Particularly where the County has admitted that it is a proper Defendant in its Answer and has waited over three years to raise this issue, the Court concludes that the County has waived its objection to its capacity to be sued.  *See Myers v. Manchester Ins. & Indem. Co.*, 572 F.2d 134, 134 (5th Cir. 1978) (finding that a party had "waived its challenge to [the defendant's] capacity to be sued" where issues of capacity did not implicate jurisdictional questions and the party had waited until the post-trial conference to raise the issue); *see also N.A.A.C.P. Labor Comm. of Front Royal, Va. v. Laborers' Int'l Union of N. Am.*, 902 F. Supp. 688, 699 (W.D. Va. 1993) (in a case involving a personal representative filing suit on behalf of a deceased plaintiff, finding that the defendants had waived their right to challenge the capacity of the plaintiff to sue where, in their Answer, they did not "by specific negative averment" challenge the allegation that the plaintiff was the proper personal representative and instead provided only a general denial), *aff'd sub nom. Baltimore v. Laborers' Int'l Union of N. Am.*, 67 F.3d 293 (4th Cir. 1995).  The Motion will be denied on this issue.

## CONCLUSION

For the reasons set forth above, the County's Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART. The Motion will be GRANTED to the extent that summary judgment will be entered in favor of the County on Officer Sharpe's race discrimination and retaliation claims related to the 2016 Transfer, the 2016 Performance Evaluation, and the 2018 Transfer Applications. It will be otherwise DENIED. A separate Order shall issue.

Date:   March 11, 2021

THEODORE D. CHUANG
United States District Judge